CARL H. JOHNSON *vs.* ANDREW C. SCOTT & others.

Suffolk. January 18, 1910. — February 25, 1910.

Present: KNOWLTON, C. J., HAMMOND, BRALEY, SHELDON, & RUGG, JJ.

*Evidence*, Presumptions and burden of proof, Of foreign law. *Equity Pleading and Practice*, Master. *Equity Jurisdiction*, To rescind sale procured by fraud. *Fraud.*

In a suit in equity to rescind for fraud a sale and conveyance to the plaintiff of all of the defendant's right, title and interest in certain real estate in another State and to restore to the plaintiff what he paid therefor, the plaintiff introduced before a master, to whom the suit was referred, evidence tending to show that the defendant had purchased the land at a tax sale in the State where it was situated, but that shortly afterwards the defendant had been told by various persons in official positions that in their opinions his title so procured was of no value, and had been shown evidences that others were claiming the land, that thereafter he represented to the plaintiff that his title was unquestionable and that he knew nothing questionable about it, and by various means induced him to purchase the land without investigating the title. *Held,* that the question,

whether the defendant's title was of value, was one of fact for the master to pass upon, and that its determination in no way depended upon whether the defendant's tax deed had or had not been avoided by a court of the State where the land was situated.

A void tax deed is not *prima facie* evidence of title.

One, who had purchased at a tax sale in another State land, which was described in the deed given to him only as "1577 acres in F. grant," and who thereafter was informed by various persons in official positions that the title which he had procured was of no value, thereafter represented to a prospective purchaser that the title to the land was unquestionable and that he knew nothing questionable about it, and, with the aid of an agent, who knowingly made like false representations, induced the prospective purchaser to buy the land without investigating the title, and to give to the holder of the tax deed $1,201 and to the agent, as a part of the same transaction, a note for $1,299, secured by a mortgage, to cover the amount of $1,300 which he supposed the agent was lending to him and which he supposed was paid to the seller. The agent paid the seller only $600. The tax title was worthless. *Held,* that the purchaser might maintain a suit in equity to rescind the transaction and to have the seller and the agent place him *in statu quo.*

A court of equity will not concern itself with the respective rights among themselves of wrongdoers who are defendants in a suit in equity to set aside a sale procured by their fraud.

BILL IN EQUITY filed on October 9, 1908, alleging that the defendants induced the plaintiff to pay money and to give a note and mortgage for a quitclaim deed of land in the State of Maine, by representing to him that the defendant Scott had a title from the State of Maine which was unimpeachable and which they had been told was unimpeachable by legal advisers, which representations they knew to be false.

The case was referred to James D. Colt, Esquire, as master. The substance of his report is as follows:

On September 21, 1904, the treasurer of the State of Maine sold to the defendant Scott for $29.16 at public auction for nonpayment of taxes land which in the advertisement of the sale had been described as containing fifteen hundred and seventy-seven acres of land lying in Fryeburg Academy Grant in the county of Oxford. The deed which he made to Scott described the land as being "situate in the county of Oxford" and as containing "1577 acres in Fryeburg Academy Grant." There was no other description. The Fryeburg Academy Grant contained about four thousand acres of land.

After he had paid taxes for several successive years upon what he supposed had been conveyed to him, Scott was told by various persons in official positions that in their opinions the

State could not have given him title, owing to the insufficiency of the description of the lands in the assessor's office. He testified that thereafter he consulted counsel in Portland, Maine, who told him in substance that he might select any fifteen hundred and seventy-seven acres of land in the Fryeburg Academy Grant and remove the timber therefrom until he was stopped by some one who could show a better title than he.

As Scott became convinced that his title to the fifteen hundred and seventy-seven acres was at least doubtful, he became correspondingly desirous of selling out, and took steps to find a purchaser. In the summer of 1908, while he was trying to find a purchaser for his title, he talked with one William M. Torrey, who afterwards called it to the attention of the defendant Murdock.

As a result of his conversation with Torrey, Murdock went to Maine and visited the property. At that time Murdock was not acquainted with Scott. He was afterwards introduced to Scott by Torrey, and became sufficiently interested to make a second trip to Maine for the purpose of ascertaining the value of the timber on the property. After inspecting the property, Murdock visited the State House in Augusta in order to find out whether Scott had paid the taxes. While there, Murdock was informed by the clerk of the State board of assessors that, in his opinion, Scott's title was worthless and that any tax title given by the State of Maine to land in the Fryeburg Academy Grant was worthless for the reason that the land in the grant had never been legally divided into lots. After making this visit to Maine, Murdock decided not to purchase from Scott.

The plaintiff is a native of Sweden. He is an attorney at law, having been admitted to the bar in 1903. Since his admission he has practised his profession in Boston.

In August, 1908, the defendant Scott was introduced to the plaintiff. At the ensuing interview Scott told the plaintiff that he had the land for sale and that his price was $3,500, but that he would sell for $2,500 cash. There were a number of interviews during the next two weeks and Scott made certain statements about the land and his title to it, in answer to inquiries of the plaintiff. He represented that he had a good title to fifteen hundred and seventy-seven acres of land in the Fryeburg Academy

Grant, and in support of this representation showed his deed from the State of Maine and certain of the tax receipts and the statutes of the State of Maine which provide that where a tax title is not redeemed within one year the fee becomes absolute in the owner of the tax title. He allowed the plaintiff to take the tax title deed for examination and urged him to go and look at the property itself. The plaintiff stated that he wished time in which to examine the title, but Scott said there were others who wished to buy the property, with whom he was talking, and he would therefore give no option. He stated that a prominent attorney in Portland, Maine, had told him he could select fifteen hundred and seventy-seven acres of land in the grant and cut the timber and that his title, coming from the State, was the best or as good as any title in the grant. Scott also called the plaintiff's attention to the fact that there was a ready market for the timber not far from the grant, and said that he was selling because he was too old to look after it himself. He also told the plaintiff, in response to inquiry, that he had given him all the information he had regarding the property and his title thereto. He did not tell the plaintiff, however, of the opinions which the Maine officials had expressed as to the infirmity of his title, nor did he tell him of the fact that the register of deeds of Oxford County had exhibited to him a plan of the Fryeburg Academy Grant which showed the grant divided into lots and had told him who occupied or claimed to own some of the lots.

At one of the early interviews regarding the purchase, Scott brought the defendant Murdock to Johnson's office and introduced him as a man who had personally examined the property and knew its value. From that time on the plaintiff had frequent interviews with Murdock who represented that he was acting as a broker for Scott in the sale of his land, that he had examined the timber and considered the property of great value. He stated that, if it were not that he was interested in a mining proposition in Nova Scotia, the plaintiff would not have had the chance to buy the land, and that he would recommend the property to his father or brother or a brother mason. The plaintiff told Murdock that he had not had time to investigate the property and must rely upon what he and Scott told him. He asked Murdock if he knew of anything out about the property, and

Murdock replied that he did not. This was after Murdock had visited the State House in Augusta and learned that the title was very doubtful. Murdock was Scott's agent throughout the negotiations and as such agent did what he could to promote the sale to the plaintiff.

The plaintiff believed the representations made to him by both Scott and Murdock, including the representation that the price to be paid Scott for the land was $2,500 in cash. He was able to raise but $1,200 of the necessary $2,500. Scott refused to accept a mortgage as part payment and the plaintiff so informed Murdock on September 25, whereupon Murdock said he would endeavor to borrow $1,300 from his sister, and if successful would lend it to Johnson, taking back a mortgage on the land for that amount as security. Murdock then went to his sister and obtained from her, not $1,300 but $600, which money was represented by a savings bank check.

On September 26, Scott, Murdock and Torrey came to the plaintiff's office late in the afternoon. The plaintiff handed $1,200 in cash to Scott, and Murdock handed Scott a savings bank check which the plaintiff supposed was a check for $1,300, but which was the check for $600 above mentioned. Scott then delivered the deed to the plaintiff, and the plaintiff delivered a mortgage and a note secured thereby for $1,299, and one dollar in cash to Murdock, and the transaction was completed.

A short time after he had received the deed from Scott, Johnson discovered the fraud.

The report continues: "No court having jurisdiction over the land in question has, so far as appeared from the evidence, held Scott's title to be invalid, nor has any one appeared claiming an adverse or superior title, and the respondents therefore urged that Johnson had obtained all that he sought to buy, an undivided interest amounting to fifteen hundred and seventy-seven acres of the Fryeburg Academy Grant, and so has no cause for complaint. This would probably be true if the State of Maine had owned the entire grant at the time it made its deed to Scott. The deed undertakes to convey a definite number of acres in a much larger tract, no part of which, so far as appears, belonged to the State, and its right to make the conveyance is a statutory right arising

out of the failure of the real owner or owners of those acres to pay the taxes assessed upon them, yet nowhere does it appear who the real owners were, nor is there anything to indicate what lands were meant by the description in the deed. There were other owners of land in the Fryeburg Academy Grant, whose titles the State had not disturbed by tax sales or otherwise. From all of which it seems clear that the deed from the State of Maine to Scott had no value as it conveyed no ascertainable interest in land located in Fryeburg Academy Grant.

" No reason exists for any one's making an adverse claim to the fifteen hundred and seventy-seven acres which the State attempted to convey. The recording of Scott's deed was not notice to any of the owners of land in the grant that he claimed or could claim an interest in their land. It is therefore not surprising that neither Scott's nor Johnson's so called title has been disputed or passed upon by a court having jurisdiction over the land.

" I find that the deed from Scott to Johnson conveyed no title as Scott had nothing to convey by virtue of his deed from the State of Maine. It is apparent from the facts found that a fraud was intentionally perpetrated on Johnson and that both Scott, Murdock and Torrey participated therein. . . .

" Furthermore, Johnson was deceived in regard to the mortgage. He was led to believe that an actual cash consideration of $1,300 was being paid for the mortgage while in reality only $600 was paid. Murdock had told him that he would try to obtain from his sister the $1,300 which with Johnson's $1,200 would make up the $2,500 required by Scott. He told him later that he had been successful in obtaining the necessary money from his sister. He did not say that all he obtained was $600 but left Johnson to infer that it was $1,300. The Savings Bank check which was handed to Scott when the papers were passed was not shown to Johnson, although he might have seen it by asking for it, and he supposed and was allowed to believe that it was for the larger amount. He could not have been more deceived, if $600 in good and $700 in counterfeit money had been handed to Scott. Johnson's note and mortgage were given to Murdock on the understanding that Murdock was to advance the full consideration therein mentioned and he supposed and had a

right to suppose that this had been done when he delivered the note and mortgage to Murdock."

The defendants filed exceptions to the master's report, material among which are the following:

"12. To the finding of the master that 'it seems clear that the deed from the State of Maine to Scott had no value,'" the stated ground of the exception being that "this is a matter of law and not of fact and outside the rule to the master and without jurisdiction of this court to hold invalid the deed of the State of Maine which has not been so held by the Maine courts."

"13. To the finding of the master that 'the deed from Scott to Johnson conveyed no title, as Scott had nothing to convey by his deed from the State of Maine,'" the stated ground of the exception being the same as that of the twelfth exception.

"14. To the finding of the master that 'it is apparent from the facts that a fraud was intentionally perpetrated on Johnson and that both Scott and Murdock and Torrey participated therein,'" the stated ground of the exception being "that the finding is a matter of law and not of fact and is outside the rules of the master and furthermore that the facts in the case as found by the master and on the evidence before him, are not sufficient to constitute an assumption of fraud."

"16. To the finding of the master that 'Johnson was deceived in regard to the mortgage and that he was misled by Murdock' and to the master's finding which compared the transaction to a possible deception by the passing of counterfeit money," the stated ground of the exception being "that the evidence shows and the master's own findings show that Johnson knew and understood that Murdock and Torrey were to receive what Johnson called a commission out of the $2,500 purchase money for the property and the fact that Murdock paid Scott in Johnson's presence $600 and retained his profit, commission or recompense for raising the money and as claimed assisting in the sale of the property, was no deception to Johnson. It is immaterial whether Murdock paid $1,300 to Scott in Johnson's presence and then received $700 back, or whether he retained it when the transaction was closed, especially as no false representation was made to Johnson and according to the master's finding, Johnson might have seen the check by asking for it."

"17. To the failure of the master to find that under the tax title deed of the State of Maine, the grantee therein would have the right to go on, cut and remove timber therefrom," the stated ground of the exception being "that a tax title deed is *prima facie* evidence of title and as such is a title of value giving the owner the right to take possession and exercise acts of ownership."

"20. To the failure of the master to find that the quitclaim deed from Scott to Johnson conveyed something of value," the stated ground of the exception being "that Scott was the owner of an undisputed title to fifteen hundred and seventy-seven acres in Fryeburg Academy Grant as evidenced by a tax title deed from the sovereign State of Maine which at least barred the State of Maine from objecting to Scott or his assigns entering the property and cutting the timber or exercising other acts of ownership over it."

The exceptions were heard and overruled and a final decree was ordered for the plaintiff by *Pierce*, J. The defendant Murdock appealed.

*W. H. Wood*, for the defendant Murdock.

*F. W. Campbell*, for the plaintiff.

SHELDON, J. Both of the defendants Scott and Murdock filed numerous exceptions to the master's report, but only Murdock has appealed from the interlocutory decree overruling these exceptions and from the final decree which was entered in favor of the plaintiff.

The sixth of these exceptions has become immaterial in consequence of the addition made by the master to his report when the matter was called to his attention by the defendants' objecjection. As to the twelfth and thirteenth exceptions, it is enough to say that the other facts found by the master fully warranted the inference that "the deed from the State of Maine to Scott had no value, as it conveyed no ascertainable interest in land located in the Fryeburg Academy Grant." The validity and value of the title created by the deed depended upon the statute law of Maine, and it was purely a question of fact what that law was. *Callender, McAuslan & Troup Co.* v. *Flint*, 187 Mass. 104, 107. *Cherry* v. *Sprague*, 187 Mass. 113, 117. *Electric Welding Co.* v. *Prince*, 200 Mass. 386. But when such

a question of fact is presented to our courts, they must pass upon it; and their right to find that under the laws of Maine a deed conveys no title, or no title that is of any value, does not depend upon the question whether the deed has or has not been avoided in a Maine court. The fourteenth, sixteenth, seventeenth and twentieth exceptions relate to findings of fact which were well warranted by the subsidiary findings made. The master was not bound to find that the sum of $700 obtained by Murdock as a secret profit from the plaintiff was really a fair commission honestly paid to him by Scott. And a void tax deed is not *prima facie* evidence of title. All the other exceptions are to mere findings of fact, as to which the evidence is not reported, and which for that reason we cannot disturb. *Lipsky* v. *Heller*, 199 Mass. 310, 313. The decree overruling the exceptions and confirming the master's report must be affirmed.

From the master's report it is plain that a fraud was perpetrated upon the plaintiff by which he was induced to pay $1,201 in money and $1,299 in his note secured by a mortgage for what was of no value, and that both Scott and Murdock participated in this fraud. The decree entered in the Superior Court was right. *Holst* v. *Stewart*, 161 Mass. 516. *Burns* v. *Dockray*, 156 Mass. 135.

We need not consider whether Murdock has any remedy for contribution or otherwise against Scott. The court does not concern itself with the respective rights of wrongdoers among themselves. *Light* v. *Jacobs*, 183 Mass. 206. *Rowley* v. *Towsley*, 53 Mich. 329.

The final decree appealed from is to be modified so as to charge Murdock with the costs of this appeal, and so modified is

*Affirmed.*